## WICHITA ENGINEERING CO. v. ROY J. HEYNE MACH. CO.

### No. 14825.

Court of Civil Appeals of Texas. Fort Worth.

March 7, 1947.

Rehearing Denied April 4, 1947.

Guy Rogers, of Wichita Falls, for appellant.

Bullington, Humphrey & Humphrey and Frank Ikard, all of Wichita Falls, for appellee.

SPEER, Justice.

At a non-jury trial appellee, Roy J. Heyne Machine Company, a co-partnership composed of Roy J. Heyne and John D. Long, recovered judgment against appellant Wichita Engineering Company, a corporation, for $10,101.60, from which judgment this appeal was perfected.

Appellant was a prime contractor with the Federal Government for the manufacture of a large number of Fragmentation Bombs. Appellant sublet to several other concerns the manufacture of a small but essential component part of each bomb, known as a "Bomb Base Closing Plug." They are referred to by the parties as "parts" and we shall so refer to them. Appellant could manufacture some of these parts in its own factory but not in sufficient quantities to supply its needs. Originally appellant was required by its contract with the government to complete its production of the bombs about the end of November 1944.

On August 2, 1944, by "Order No. 8727" (regarded by all parties as a written contract), appellant sublet to appellee the manufacture of 100,000 of these "parts." The order-contract on its face provides: (1) The kind of material from which they were to be made; (2) the first 5000 parts to be paid for by appellant at .33½ cents each and the remainder at .30 cents each; (3) required delivery to appellant, 5000 in August, 25,000 in September, 30,000 in October and 40,000 in November, 1944; (4) all parts subject to inspection and approval by appellant at its factory; (5) (there are two finely printed rubber stamp indorsements on the face of the photostatic copy before us which are illegible) but appellees concede that they were to furnish the material for the manufacture of the parts.

On September 12, 1944, appellee had manufactured and shipped to appellant 26 sample parts, and no more, On October 14, 1944, appellant wrote appellee and enclosed a document which it said was received from the federal authorities designated as a "Uniform Termination Clause" for existing contracts in which the government was interested; the instrument was to become a part of and an amendment to appellant's original Order No. 8727 contract with appellee. We shall, a little later, again refer to this instrument.

On October 24, 1944, appellant wrote appellee, in effect, that owing to the fact that it was manufacturing some of the parts which it had ordered through the Order No. 8727, the required number as provided by the original order was reduced from 100,000 to 55,000. Neither in that letter, nor by anything else in the record, were any other conditions or provisions of the original contract made in August 1944, changed up to that time.

In October, 1944 appellant's factory was destroyed by fire and on that account the government extended the time in which it was to furnish the Fragmentation Bombs, from the last of November 1944 to January 1945. That contract was completed by appellant in January 1945 and the government gave it another contract for something over 400,000 additional Fragmentation Bombs, and it went immediately into the production of the last order.

After appellee received and accepted the Order No. 8727 for manufacture of the parts called for therein and upon the schedule named, it had much trouble in adjusting its machinery and equipment extending far beyond the time given it in the schedule and not until in January 1945 could it begin to produce the parts.

Just here, we deem it expedient to call attention to the provisions in the "Universal Termination Clause" instrument before mentioned. It was unquestionably made a part of the original order contract under which both parties had theretofore and

subsequently acted. We think a proper construction of that instrument will shed light on the present controversy. It will be noted by its very caption, that it shows to be an "Amendment of Wichita Engineering Company's P. O. Contract No. 8727, Dated August 2, 1944." Some parts of the instrument are not applicable to any of the facts in this case and we will therefore delete them. In considering the instrument we shall deem appellee (Machine Co.) the "seller" and appellant (Engineering Co.) "buyer". After deletions mentioned, it reads:

"Amendment of Wichita Engineering Company's P. O. Contract No. 8727, Dated, August 2, 1944.

"(a) The buyer may terminate work under this order in whole or in part at any time by written or telegraphic notice, whenever, without the fault of the buyer, (1) * * *; or (2) a contract between the buyer and a third person requiring its performance, articles or services of the kind or type covered by this order is terminated, in whole or in part, or amended to eliminate or reduce such requirement. Such notice shall state the extent and effective date of such termination; and, upon receipt thereof, the seller will, as and to the extent directed by the buyer, stop work under this order, * * *, and take any necessary action to protect property in the seller's possession in which the buyer has or may acquire an interest.

"(b) If the parties cannot by negotiation agree within a reasonable time upon the amount of fair compensation to the seller for such termination, the buyer in addition to making prompt payment of amounts due for articles delivered or services rendered prior to the effective date of termination, will pay to the seller the following amounts without stipulation:

"(1) The contract price for all articles or services which have been completed in accordance with this order and not previously paid for.

"(2) (i) * * *.

"(3) The reasonable costs of the seller in making settlement hereunder and in protecting property in which the buyer has or may acquire an interest.

"Payments under this paragraph (b), exclusive of payments under subparagraph (3) shall not exceed the aggregate price specified in this order, less payments otherwise made or to be made.

"(c) With the consent of the buyer, the seller may retain at an agreed price or sell at an approved price any completed articles, or any articles, materials, work in process or other things the cost of which is allocable or apportionable to this order under paragraph (b) (2) above, and will credit or pay the amounts so agreed or received as the buyer directs. As directed by the buyer, the seller will transfer title to, and make delivery of any such articles, materials, work in process or other things not so retained or sold, appropriate adjustments will be made for delivery costs or saving therein.

"(d) The provisions of this Article shall not limit or affect the right of the buyer to terminate this order for the default of the seller."

On March 10, 1945, appellant wrote appellee concerning the contract for the 55,000 parts referable to the original order and its amendment, and used this language: "We are, due to the rescheduling of the Ordnance Department and the manufacture of 20# Fragmentation Bombs, going to close our manufacture not later than July 1, 1945. Due to the cut of this progress and our termination of this contract at that time, it would be especially necessary that we have all of the base closing plugs which you are making for our production completed by May 1, 1945. Please advise the writer if there will be any question as to whether or not this can be accomplished." The record does not disclose that appellee replied to that letter, although it was received.

On May 14, 1945, appellant sent the following telegram to appellee: "Advise status on complete base plugs also quantity of unused material, contract closes on May 18th." There was no reply to that message.

A telephone conversation was had between the managing parties on May 19, 1945. The parties differ slightly as to the substance of that conversation. Appellee

said its trend was that appellant was negotiating with the government as to when its prime contract would be terminated, and that appellant was trying to arrive at a source where it could dispose of surplus material; that they could not determine just when this could be done.

Appellant's version of that conversation was that appellee was told appellant was going to discontinue manufacturing the bombs due to the completion of the contract with the government, and not as a convenience to the government; that appellant wanted to aid appellee in disposing of materials and advised the name of a concern on the West Coast making Fragmentation Bombs; that the conversation took place on a Saturday and on Monday following (May 21, 1945), he wrote a letter to appellee confirming the conversation. The letter is in the record and reads in part:

"Confirming our telephone conversation of May 19, 1945" referring to contract order No. 8727, etc. "Reference is made to our letter of March 10, 1945, advising that we were terminating our contract June 1, 1945, and that all production as per the above subject order must be completed by May 1, 1945.

"In lieu of the above and our telephone conversation of May 19, 1945, we feel that, as our contract will be completed May 22, all future plugs forwarded to the Wichita Engineering Co., should be held and sold with the surplus material that we have on hand and payment be according to the prevailing price at the time of sale."

There is yet another paragraph in the letter which indicates that the writer expressed the belief that surplus material could be disposed of in 30 to 60 days, at which time it would make payment to appellee for such amounts as were owing.

Appellee replied on May 22, 1945, and acknowledged receipt of the letter of May 21, and said: "It was not our understanding from our telephone conversation of May 19, that shipments were to stop on May 22, and we are continuing to ship completed parts until the first of June." Another paragraph in the letter says they

have written the parties on the coast, as suggested in the May 19, conversation about selling the plugs directly to them, but have had no reply. The appellant made no reply to appellee's last mentioned letter.

Appellee continued to ship parts to appellants in increased numbers throughout May and until June 28, 1945. Appellant's manager testified at one time that his company received all shipments up to May 22, 1945, and used the parts in production but later testified that he did not mean to make that statement. He said his company finished its contract with the government on May 22, 1945, but that they had on hand enough component elements to make 38,000 more bombs and the government authorized it to manufacture that number more. The record does not disclose at what time after May 22 the 38,000 bombs were made.

On June 29, 1945, appellant wired appellee as follows: "Unable to dispose of any more bomb base closing plugs at any price so suggest you make no further shipments to us." No more shipments were made by appellee after June 28, 1945.

As we construe appellee's pleadings in this case, it is an action against appellant to recover for the contract price of all parts manufactured under the contract; but is not a suit to recover damages for a breach of the contract by appellant wherein appellee would be deprived of the profit it might make in the manufacture of the entire 55,000 parts, for its wrongful termination nor for quantum meruit.

■ It is undoubtedly true that appellee was at all times, at least up to March 10, 1945, in default of its performance of the contract, but it is equally true that appellant was accepting the parts so shipped during that time and thereby waived any right of forfeiture because of default; but by its letter of March 10, it effectively extended the period of time for delivery of parts until May 1, 1945. Our construction of the amended contract leads us to believe that appellant had the right to thus extend the time, if agreeable to appellee, and also to set a definite date of the end of the extended period as of May

1, 1945. It is obvious that appellee was willing to the extended period, although there was a difference of opinion between the parties as to the end of the extended period, as revealed by appellee's letter of May 22, 1945, previously mentioned, in which appellee had said it was their understanding that they had until June 1, 1945, and would continue to ship parts until that time.

■ Appellant's former letters had indicated that it would finish its contract with the government at two different dates, that of July 1, and June 1, but each time suggested that parts shipped by appellee must be received by May 1, 1945. On May 21, 1945, appellant wrote appellee that the contract would be finished on May 22 following. It seems that from the telephone conversation on May 19, and the letter of May 21, appellee construed them to mean they could continue to ship until June 1, 1945, and so stated in their letter of May 22. In view of the amended contract, the many conversations on the telephone and the several letters mentioned, appellee's construction of them all was not an unreasonable nor unwarranted one, more especially when brought to appellant's attention and it made no protest or objection to appellee's construction and understanding. Where doubt exists as to the meaning of a contract made up as was this one, the courts may consider the interpretation placed on its terms by the parties themselves. Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W. 2d 504.

■ As we construe the contract as a whole, it is plain to us that the judgment entered for appellee is not supported by the record. We say this for the reason, as above pointed out, the judgment was for $10,101.60; that is the exact amount sued for and appellee's contention in support of it is based upon the testimony of its manager who said the books were kept under his supervision and were correct; upon being handed a "sheet," apparently one from the books, he read from it showing approximately 60 separate shipments of parts from the beginning through June 28, 1945, giving the date of each ship-

ment, and the number included, aggregating 22,483, to which he added 5280 parts left on hand, making a total number manufactured of 27,763. (To get this total we have added a shipment of 384 parts on March 1, not mentioned by the witness, but admitted by appellant to have been received.) The witness then said the total number shipped and those on hand amounted to 29,536 parts, making a difference in his own figures of approximately 2,000 parts; one or the other is wrong; he then said the parts so manufactured amounted to $8851.60; neither of his totals come to the amount claimed; to his last above figures he added $1,250 for surplus steel on hand, making the total amount for which he sued and recovered. We are unable to find anything in the contract which would entitle appellee to recover for parts shipped after June 1, 1945, nor for the surplus steel on hand purchased to carry out the contract.

Appellant relies upon eight points of error for reversal and rendition of judgment by us; these points present in one form or other all phases of the case discussed by us. The contention that we should render a judgment is based upon an admitted tender of payment by appellant before suit was filed in the sum of $1,176.86. This tender was predicated upon the account between the parties shown by appellant's books for parts shipped prior to May 22, 1945, plus enumerated parts sold by appellant as surplus materials, less the contract price of rejected parts, the car of steel sold to appellee and a cash payment of $95. In view of the hopeless conflicts in the testimony, especially in regard to the value of rejected parts and not made good, payment of the car of steel and the cash payment, we are not authorized to accept appellant's theory in these respects.

■ It is worthy of note also, that appellant claims a credit for rejected parts. But appellee testified that all rejected parts were worked over by them and re-shipped under separate billings. If this theory is correct (and it is apparently so reflected by the account kept by appellant), no credit should be allowed for them. The car of

steel was admittedly purchased by appellee and appellee admits in the brief that the amount has not been paid. Certainly a credit should be allowed for its value. Appellee insists however that appellant's pleadings do not claim it as an offset, but the issue of payment was tried out without objection, and under Rule 67, Texas Rules Civil Procedure, it must be assumed that the pleadings were sufficient in this respect. The credit of $95 claimed by appellant to have been by check was only inferentially denied by appellee, when the witness said $65 was the only payment received; it will be noted that appellee did not allow credit on the account for the $65 admittedly received. Appellee having purchased the car of steel with which to make the parts, it was charged with notice that the whole contract could be terminated before completion of the 55,000 parts and there is no basis in the record for their recovery of the value of steel left on hand after the contract was so terminated.

■ Unquestionably, appellees had many misfortunes with their plant and machinery when they began to perform this contract and there was apparent disappointment in the speed with which appellant completed its contracts with the government upon which this contract was dependent. All these things worked to the financial detriment of appellee. Appellee may have made an improvident contract but there is nothing this court can do about it. It is settled law that parties are bound by such legal contracts as they make. Pyle v. Eastern Seed Co., Tex.Sup., 198 S.W.2d 562.

It is quite apparent to us that the testimony in many respects was not fully developed upon the trial of this case, upon any theory presented by the pleadings, and that the best interest of all parties concerned would be best subserved by reversing the judgment for another trial.

If the pleadings upon another trial remain as they now stand, the contract with all its amendments, both express and fairly implied, should be construed as we have herein indicated, and judgment entered for any amount shown to be due and owing, giving effect, of course, to all legitimate credits to which appellant may show itself entitled.

For the reasons pointed out the judgment of the trial court is reversed and the cause remanded for another trial. Reversed and remanded.